21

FILED *re*

NOV 26 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

In re                                    Case No. 12-13341
                                         DC No. JHA-2
ALVIN L. SOUZA, JR. and
ROBYN G. SOUZA, dba
ALVIN SOUZA DAIRY,


                        Debtor.
_____/

**Memorandum Decision Regarding Motion for Stay Relief**

Chapter 11 debtors in possession opposing stay relief must show effective reorganization is reasonably possible. Souzas operate a dairy. They are financed by Wells Fargo Bank, to whom they owe $20.6 million, secured by all of their assets, including milk proceeds. Souzas have lost money for the last 42 months. Other than milk proceeds, they have no working capital; Wells Fargo objects to further use of milk proceeds to fund dairy operations. Is reorganization possible?

**Facts**

Alvin Souza has spent his life working with cattle. Throughout the 1980s he worked on a dairy farm as an employee, feeding and milking cows. By 1990s he bought 50 cows and 150 calves and started his own dairy. Over the next 20 years, with the assistance of his wife, Robyn, Souza grew his dairy operation. The herd increased to 30,000 animals. He integrated vertically, starting a calf ranch, trucking company and

1

farming operation.   The calf ranch provided a source of livestock to replace the older dairy cows as they were retired.   The trucking operation transported the animals and the farm produced silage and hay used for feed.   And the dairy produced milk, which it sold.

But with big growth came big debt.   By 2009, the Souzas were indebted to Wells Fargo Bank more than $35 million.

Starting in 2009, the dairy industry encountered hard times.   Milk prices dropped, and stayed down.   Feed prices, which comprise the bulk of their operating expenses, rose.   The Souzas were not spared.   As prices dropped and feed costs increased, their cash flow dwindled.   Wells Fargo became concerned about the Souzas' large outstanding debt and placed it with their special assets department.   Suppliers demanded cash payment upon delivery.   Collection lawsuits started.

The Souzas' last profitable month was March 2009.

### Procedural History

In April 2012, the Souzas filed for Chapter 11 protection.   When they did, they owned seven parcels of real estate, dairy and farm equipment, and upwards of 30,000 head of cattle.   Tr. Hr'g. on Mot. Stay Relief at 526:20-22, November 6, 2012, ECF No. 1062.   They owed Bank of the West $9.5 million, secured by a first deed of trust against their real estate.   Souzas also owed Wells Fargo Bank two notes totaling about $30 million, which were secured by a second deed of trust against real estate and a first position security interest against all business assets, including livestock and milk checks.   The only business asset omitted from the list of collateral was rolling stock.   Tr. Hr'g. on Mot. Stay Relief at 131:1-133:3.

Over the next five months, the Souzas and Wells Fargo Bank agreed to seven interim cash collateral orders, under which the Souzas operated

2

their dairy and farming business.    See e.g., Seventh Interim Order Authorizing Use of Cash Collateral, September 21, 2012, ECF No. 828.    As a part of the agreement to use cash collateral, Wells Fargo demanded--and the Souzas agreed to--two conditions.    First, spurred by continuing monthly losses, the bank required a rapid reduction in the size of the dairy and related herds.    Second, Wells Fargo Bank received a replacement lien against all of the debtors' assets acquired after the petition date. Fifth Interim Order Authorizing the Use of Cash Collateral ¶10, July 25, 2012, ECF No. 571.

In August 2012, Souzas' period of plan exclusivity expired without a plan filed.

But later the Souzas did file a plan.    Plan, August 17, 2012, ECF No. 706.    The plan had three primary parts.    First, it bifurcated Wells Fargo's debt into a secured claim of $9 million and an unsecured claim of $11 million.    Second, it provided for payments to secured and, eventually, unsecured creditors for five years.    Under the plan, each secured creditor's loan would be paid down, but not paid off, during the five-year period and unsecured creditors (other than the Wells Fargo unsecured claim) would receive a 27% dividend.    Wells Fargo would receive no payment on its unsecured claim.    Third, at the end of the five-year plan, the Souzas would refinance the remaining portion of the secured debt with a new lender, paying off Bank of the West and Wells Fargo Bank. The refinance component of the plan assumed the Souzas' real estate would appreciate 5% each year for the five years of the plan, such that they would qualify for a loan under conventional lending standards.    Not interested in reorganization, Wells Fargo demanded liquidation and the Souzas made no further effort to prosecute the plan.

Dissatisfied    with    the    debtors'    prospects    for    effective

3

reorganization, Wells Fargo Bank moved for stay relief pursuant to 11 U.S.C. § 362(d)(1),(2).   Bank of the West supported the motion.   The Souzas, supported by the Committee of Unsecured Creditors, disagreed. A three-day evidentiary hearing followed.   By the date of the hearing, Souzas had reduced their business to a dairy herd of about 8,500 animals and a supporting farming operation.   Tr. Hr'g. on Mot. Stay Relief at 526:23-527:9, November 6, 2012, ECF No. 1062.   Proceeds from the sale of cattle had reduced the debt to Wells Fargo Bank to $20.9 million.   Tr. Hr'g. on Mot. Stay Relief 131:11-14, October 26, 2012, ECF No. 1016.

Souzas have requested an additional 60 days to file an amended plan of reorganization.   Tr. Hr'g. on Mot. Stay Relief at 556:1-8, November 6, 2012, ECF No. 1062.

Beyond the loans from Wells Fargo Bank, who is secured by a blanket security interest in the debtors' assets, including cash collateral, Souzas have no other assets or income from which to fund a plan.   Tr. Hr'g. on Mot. Stay Relief at 171:1-4, October 26, 2012, ECF No. 1016; Tr. Hr'g. on Mot. Stay Relief at 557:5-16, November 6, 2012, ECF No. 1062. They have attempted, unsuccessfully, to secure a loan from third party lenders.   Declaration of Alvin Souza ¶21, October 12, 2012, ECF No. 877.

## Jurisdiction

This court has jurisdiction.   28 U.S.C. § 157 and § 1334 and General Order No. 182 for the U.S. District Court for the Eastern District of California.   This is a core proceeding.   28 U.S.C. § 157(b)(2)(G).   Venue is proper.   28 U.S.C. § 1409.

## Discussion

I.     **Section 362(d)(2): Stay Relief and Effective Reorganization.**

Filing a petition under Chapter 11 of Title 11 of the United States Code creates a stay protecting the debtor and property of the estate.

1  11 U.S.C. § 362(a)(1), (3).

2      A creditor may obtain relief from the stay by demonstrating that the
3  debtor has no equity in the property for which relief is sought and that
4  the property is not necessary for the debtor's effective reorganization:
5  " On request of a party in interest and after notice and a hearing, the
6  court shall grant relief from the stay provided under subsection (a) of
7  this section, such as by terminating, annulling, modifying, or
8  conditioning such stay... (2) with respect to a stay of an act against
9  property under subsection (a) of this section, if- (A) the debtor does
10  not have an equity in such property; and (B) such property is not
11  necessary to an effective reorganization." 11 U.S.C. § 362(d)(2).

12      The party seeking stay relief has the burden of demonstrating the
13  lack of equity; the party opposing stay relief bears the burden of proof
14  on all other issues.  11 U.S.C. § 362(g); *see also, In re Bonner Mall*
15  *Partnership,* 2 F.3d 899, 902 (9th Cir. 1993).  Since the debtors in this
16  case concede that there is no equity in the collateral and Wells Fargo
17  admits that cows are necessary to a dairy operation, the only issue is
18  the ability of the debtors to successfully reorganize.  Response to Wells
19  Fargo Bank's Motion for Relief from the Automatic Stay, p. 2, line 23,
20  August 21, 2012, ECF No. 719; *see also,* Tr. Hr'g. on Mot. Stay Relief at
21  187:24-188:2, Oct. 26, 2012, ECF No. 1016; Tr. Hr'g. Mot. Stay Relief at
22  316:22-317:4, 329:9-330:6, November 5, 2012, ECF No. 1051.

23      The Supreme Court has articulated the showing required under the
24  reorganization language of § 362(d)(2) stating there must be "a
25  reasonable possibility of a successful reorganization within a reasonable
26  time."  *United Sav. Assn v. Timbers of Inwood Forest Assoc., Ltd.,* 484
27  U.S. 365, 376 (1988).

28      Since the *Timbers of Inwood,* decision courts have attempted to

5

particularize this standard.  The Ninth Circuit Bankruptcy Appellate Panel has embraced a four-part test first articulated in *In re Holly's, Inc.,* 140 B.R. 643, 700 (Bankr. W.D. Mich. 1992), which describes the debtor's burden of proof as a "moving target which is more difficult to attain as the Chapter 11 case progresses."  *See, In re Sun Valley Newspapers, Inc.,* 171 B.R. 71, 75 (B.A.P. 9th Cir. 1994).  The *Holly's,* court separated the burden of proof into four distinct stages based on when the creditor seeks relief: "The four broad categories can be stated as follows: (1) is it *plausible* that a successful reorganization will occur within a reasonable time?; (2) is it *probable* that a successful reorganization will occur within a reasonable time?; (3) is it *assured* that a successful reorganization will soon occur?; or (4) is it *impossible* that a successful reorganization will occur within a reasonable time?" *Holly's,* 140 B.R. at 700 (emphasis original); *see also, Sun Valley Newspapers, Inc.,* 171 B.R. at 75.

Holly's, teaches us that the standard articulated in *Timbers of Inwood,* imposes an increasing burden of proof on the debtor regarding the viability of reorganization as a means of balancing a debtor's need to reorganize against the delay, and consequent harm, imposed on creditors by the stay.  Initially the balance favors the debtor in possession.  But the burden of proof rapidly shifts in favor of secured creditors, requiring a heightened showing by the debtor of its chances for reorganization.  Immediately after the case is filed, a debtor in possession opposing stay relief may offer a "less strenuous" showing of "a reasonable possibility of successful reorganization within a reasonable time."  During this stage, the debtor sustains the burden of proof by offering sufficient evidence that a successful reorganization within a reasonable time is "plausible."  The standard is low, requiring

the debtor only to present evidence that is "superficially worthy of belief" that it is capable of producing a plan.  The terms of the plan can be obscure and vague, as long as it is plausible that a successful reorganization may occur.  The bankruptcy court's mandate is to balance the reasonableness of the delay borne by the secured creditors against the debtor's ability to formulate a plan.  Immediately after the case is filed, if the debtor presents any evidence that a confirmable plan is plausible, the balance favors the debtor and the creditors are expected to wait while the debtor attempts to craft a plan.  *Holly's,* 140 B.R. at 701.

Near the expiration of the exclusivity period, a greater showing is required; the debtor must show that a successful plan of reorganization is "probable."  "Probable" requires an evidentiary showing that it is more likely than not that the debtor is capable of producing a plan that is confirmable.  Though not required to produce a plan or satisfy confirmation standards, it must produce sufficient evidence "that the tools necessary to formulate a plan are available."  During this phase of the case, "the balance between the reasonableness of the delay borne by the secured creditors and the debtor's ability to formulate a plan is approximately equal."  If the court forms the belief that successful reorganization is not probable, no further delay is warranted and the court should grant stay relief.  *Holly's,* 140 B.R. at 701-02.

After exclusivity ends, the debtor faces the "most stringent and convincing showing" as to the viability of reorganization.  The debtor must offer evidence that a successful reorganization within a reasonable time is "assured."  "Assured" means that evidence offered in opposition to the motion for stay relief demonstrates that it is "certain or unquestionable that *a plan* to be  considered at confirmation *will soon*

7

*be produced.*" (emphasis original).  Even at this late stage the debtor is not required to produce a plan to defend a motion for stay relief. But the debtor must produce "concrete evidence" that a plan capable of confirmation is forthcoming.  After the expiration of the exclusivity period, the "balance between the reasonableness of the delay borne by a secured creditor and the debtor's ability to formulate a plan favors the creditor."  If the debtor fails in its showing the creditor should be put to no further delay and the stay lifted.  *Holly's,* 140 B.R. at 702.

Finally, notwithstanding the amount of time that a case has been pending, whether long or short, the court must grant relief if successful reorganization is "impossible."  "Impossible" means there is a "lack of any realistic prospect of effective reorganization."  *Holly's,* 140 B.R. at 702-03.

In this case, the period of exclusivity expired on August 11, 2012, with no plan filed.  *Compare,* Voluntary Petition, April 13, 2012, ECF No. 1, with 11 U.S.C. §1121(c)(2).  As a result, Souzas are held to the most rigorous standard of proof.  They must demonstrate that it is "certain or unquestionable that a plan" capable of confirmation "will soon be produced."  *Holly's,* 140 B.R. at 702.  It is against the backdrop of this most demanding burden of proof that the court considers the motion.

## II.    Timing.

After the period of exclusivity has expired, the debtor must provide concrete evidence that a plan to be considered at confirmation "will soon be produced."  *Holly's,* 140 B.R. 700, 702.      The debtors have not sustained their burden of proof.  This case was filed eight months ago. Beyond the August 2012, plan, which the debtors abandoned, no plan has been filed.  The debtors have asked for an additional 60 days to

formulate a plan.  Tr. Hr'g. on Mot. Stay Relief at 556:1-8, November 6, 2012, ECF No. 1062.  With the possible exception of September 2012, the debtor has lost money in each of the last 42 months, including the six months since the case was filed.  Tr. Hr'g. on Mot. Stay Relief at 174:10-12, October 26, 2012, ECF No. 1016; Tr. Hr'g. on Mot. Stay Relief at 555:23-25, November 6, 2012, ECF No. 1062.  The shortfall has been absorbed by Wells Fargo Bank from milk checks and the sale of non-renewable collateral (dairy cows not otherwise scheduled for retirement). Tr. Hr'g. on Mot. Stay Relief at 497:23-508:12, November 6, 2012, ECF No. 1062.  At the hearing, Alvin Souza, the only witness offering testimony on the timing of an amended plan, did not know when a plan would be filed.  In response to questions by Wells Fargo Bank he testified:

> Q.   Let me ask you this, at this point, Mr. Souza, are you
>      prepared to file a plan next week?
>
> A.   I'm not sure.
>
> Q.   Week after?
>
> A.   I'm not sure.
>
> Q.   Do you think you can do it before Christmas?
>
> A.   Possibly.
>
> Q.   But at this point you don't know when you are going to
>      file an amended plan, do you?
>
> A.   No.

Tr. Hr'g. on Mot. Stay Relief at 201:5-14, Oct. 26, 2012, ECF No. 1016; see also, Tr. Hr'g.. at 556:5-11, November 6, 2012, ECF No. 1062.

Not having offered concrete evidence as to when an amended Chapter

11 plan will be filed, the Souzas have not carried their burden of proof on the issue.

### III. Viability of reorganization.

After the period of exclusivity has expired, the debtor must show, with a high degree of certainty, that they are able to propose a successful plan of reorganization. *Holly's,* 140 B.R. 700, 702. The debtors have not sustained their burden.

#### A.    Cramdown

Chapter 11 plans may be confirmed by consent or by cramdown. 11 U.S.C. § 1129(a), (b). Consensual confirmation requires acceptance by all impaired classes. 11 U.S.C. 1129(a)(8). In the absence of acceptance by all impaired classes, the debtor must confirm the plan, if at all, by cramming it down. 11 U.S.C. 1129(b). Cramming down confirmation requires that the plan not discriminate unfairly and be fair and equitable with respect to each impaired class that did not accept the plan. 11 U.S.C. § 1129(b). Wells Fargo has signaled its unwillingness to consent to any plan of reorganization, demanding the debtor liquidate its assets. Tr. Hr'g.. on Mot. Stay Relief at 430:3-12, November 5, 2012, ECF No. 1051. As a result, any plan of reorganization must be confirmed, if at all, by cramdown.

The plan may satisfy the fair and equitable standard in one of three ways. It may provide that: (1) the secured lender retain its liens and be paid in deferred payments an amount that equates to the present value of the secured creditor's claim; (2) the collateral be sold free and clear of liens with the liens attaching to the proceeds and treating the claim under either of the other two alternatives; or (3) the secured creditor realize the "indubitable equivalent" of its claim. 11 U.S.C.

10

§1129(b)(2)(A).      The problem is that the debtors cannot get there from here.  Section 1129(b)(2)(A)(I) requires that the plan provide that the non-consenting, impaired secured creditor "retain the liens securing such claims" to the extent of the allowed amount of such claims and receive "deferred cash payments" totaling the allowed amount of the claim as of the effective date of the plan.   But the use of a secured creditor's collateral post-confirmation to pay lower priority creditors as a means of reorganizing is not fair and equitable within the meaning of § 1129(b)(2)(A)(I).   *See e.g., In re Griswold Bldg., LLC,* 420 B.R. 666, 705-06 (Bankr. E.D. Mich. 2009) (use of cash collateral rent to pay professional fees, priority and unsecured claims); *In re Maryslake Village-Plainfield Campus, Inc.,* 441 B.R. 309, 322 (Bankr. N.D. Ill. 2010) (rents); *In re Southside House, LLC,* 474 B.R. 391, 412 fn. 5 (Bankr. E.D. NY 2012).  Except as to real property, Wells Fargo Bank has a first position security interest in all of the Souzas' assets, including the milk check proceeds.   Tr. Hr'g. on Mot. Stay Relief at 171:1-14, Oct. 26, 2012, ECF No. 1016.  From there it necessarily follows that the Souzas cannot show that a plan of reorganization using the milk checks as a means of funding meets the first prong of the fair and equitable standard.

Section 1129(b)(2)(A)(iii) offers the debtor the ability to show that the plan is fair and equitable by showing that the secured creditor will realize the indubitable equivalent of its secured claims.  A debtor wishing to use the secured creditor's cash collateral post-confirmation and who seeks to cramdown the plan must show that the creditor is receiving the indubitable equivalent.  The Ninth Circuit Court of Appeals requires two showings when a debtor wishes to cramdown a plan against

11

1  secured creditors by invoking § 1129(b)(2)(A)(iii): that the plan

2  "compensate for present value" and "insure the safety of the principal."

3  *Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus.,*

4  *Inc.)*, 734 F.2d 426, 433 (9th Cir. 1984), abrogated on other grounds by

5  *United Sav. Assn v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365,

6  376 (1988). Where the plan changes a secured creditor's rights in the

7  collateral, providing the indubitably equivalent requires that the plan

8  provide substitute collateral or other assurances that the creditor's

9  risk is not increased. *Arnold & Baker Farms v. United States (In re*

10 *Arnold & Baker Farms)*, 85 F.3d 1415, 1422 (9th Cir. 1996). This

11 principle has been well recognized in the context of using cash

12 collateral post-confirmation to fund a Chapter 11 reorganization. *See*

13 *e.g., In re Griswold Bldg., LLC,* 420 B.R. 666, 705-06 (Bankr. E.D. Mich.

14 2009) (..."Debtors propose to use the Lender's cash collateral to pay

15 claims that have a lower priority under the Bankruptcy Code than the

16 claims of the Lender, without providing any replacement collateral for

17 the Lender. It is hard to see how that is fair and equitable."). In

18 this case Wells Fargo Bank has a security interest in the proceeds

19 generated by the dairy. A plan that uses those proceeds as a part of the

20 reorganization cannot, without some additional protection for the

21 creditor, be fair and equitable. And since the Souzas have no

22 unencumbered assets or income, it necessarily follows that they cannot

23 provide Wells Fargo Bank the indubitable equivalent of its claim. Tr.

24 Hr'g.. Mot. Stay Relief at 511:8-22, November 6, 2012, ECF No. 1062. As

25 a result, the Souzas have not carried their burden of proof.

26    **B.   Administrative insolvency.**

27    Unless the claimant agrees otherwise, administrative expenses,

28

specified priority claims and U.S. Trustee's fees must be paid in full, in cash, on the effective date of the plan. 11 U.S.C. § 1129(a)(9)(A), (12).

Souzas contend that administrative expenses, priority claims and U.S. Trustee's fees total $787,550.[1] Chapter 11 Plan Budget, p. 2, column 2. Souzas concede that they have no agreement for the deferred payment of these claims. Tr. Hr'g. on Mot. Stay Relief at 208:7-14, Oct. 26, 2012, ECF No. 1016.

The Souzas also have no ability to pay these amounts. There are two species of this problem. First, the Souzas' dairy operation is not generating sufficient monies to pay the administrative expenses, priority claims and U.S. Trustee's fees on the effective date of the plan, which must be in the very near future. *United Sav. Assn v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. at 376. Viewed most favorably to the debtors, as of November 1, 2012, cash on hand was about $242,000. Tr. Hr'g. Mot. Stay Relief at 384:22-385:10, November 5, 2012, ECF No. 1051. An unknown but sizeable portion of that amount must be held back for Souzas' operating expenses. But even if it were all applied to the administrative expenses, priority claims and U.S. Trustee's fees, the amount is short of the $787,550 necessary to pay those expenses.

Second, this money is not available for payment of those amounts.

---

[1] This amount is comprised of § 503(b)(9) claims of $205,000; professional fees (legal) of $145,000, professional fees (accounting) of $147,000; administrative income taxes of $260,550; and U.S. Trustee's fees of $30,000. The court notes an arithmetic error in Exh. S, p. 2, column 2, wherein the debtors added legal fees of $145,000 and accounting fees of $147,000 and arrived at the sum of $145,000. Beyond that, the § 503(b)(9) claims are actually $512,303.56, not $205,000. See Order Allowing in Part and Denying in Part Payment of 11 U.S.C. § 503(b)(9) Claims, October 3, 2012, ECF No. 847. As a result, the total administrative, priority and U.S. Trustee's claims that must be paid on the effective date of the plan are $1,094,853.56.

Wells Fargo Bank has a security interest in milk proceeds, as well as other collateral, and has not consented to the use of these funds. Tr. Hr'g. on Mot. Stay Relief at 171:1-14, Oct. 26, 2012, ECF No. 1016. Administrative expenses do not have priority over secured claims. *See,* 11 U.S.C. § 506, 1129(a)(b)(2); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5 (2000); *United Sav. Assn v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. at 378-79. The Souzas admit that they have no other source of cash and no unencumbered assets from which to make payment. Tr. Hr'g. on Mot. Stay Relief at 171:1-14, Oct. 26, 2012, ECF No. 1016. As a result, the case is administratively insolvent and plan confirmation cannot be achieved in the reasonably near future.

## C.   Not feasible.

Section 1129(a)(11) requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." *In re Olde Prairie Block Owner, LLC,* 467 B.R. 165 (Bankr. N.D. Ill. 2012) (§ 1129(a)(11) (standard applied to motion for stay relief)). The debtor need only show a reasonable probability of success. *In re Acequia, Inc.,* 787 F.2d 1352, 1364 (9th Cir. 1986). Feasibility determinations must be "firmly rooted in predictions based on objective fact." *In re Clarkson,* 767 F.2d 417, 420 (8th Cir.1985). Relevant factors include adequacy of the debtor's capital structure; adequacy and accuracy of the debtor's financial projections; existing conditions in the debtor's industry; ability and stability of the debtor's management; and such other factors that impact success. *In re Adamson Co., Inc.,* 42 B.R. 169, 174-175 (Bankr. E.D. Va. 1984); *In re Elsinore Shore Assocs.,*

14

91 B.R. 238, 275-278 (Bankr. D. N.J. 1988).

Souzas suggest a three-prong strategy for reorganization. The first prong of the Souzas' plan is downsizing, allowing them to grow a much larger percentage of the silage and hay on their own land. By so doing, they will stabilize supply and reduce the overall cost of feed, which represents the largest portion of their operating costs. By the date of the stay relief hearing the debtors had consolidated their operations to just two locations and reduced the herd size from about 30,000 animals to just about 8,500. The second prong is increased productivity of their herd. Souzas have done so, first by keeping only the most productive cows as they reduced their herd size, and second by improving the feed ration to the animals, thereby increasing the number of pounds of milk per day that each cow produces. Historically, the animals have each produced an average of 52-54 pounds per day; the debtors' August 2012, plan assumes production of 62-64 pounds of milk per cow per day. Third, and finally, under the terms of the August 2012, plan-and likely any future plan-Souzas would make payments for a period of time followed by a balloon payment. Souzas suggest that plan payments come from dairy profits and the balloon payment from a refinance of their real estate. The refinancing component of the plan assumes that their real estate will appreciate 5% for each of the next five years, such that the Souzas will be able to obtain new financing.

With one exception, the factors described in *Adamson Co., Inc.,* and *Elsinore Shore Assocs.,* preclude a finding of feasibility. First, the debtors' management is stable and capable. Operations at the Souza dairy are well overseen by Alvin Souza, who has more than 23 years of experience in the dairy and related industries. Tr. Hr'g.. Mot. Stay

15

Relief at 525:1-527:1, November 6, 2012, ECF No. 1062. Souza's management is backed by the able efforts of farm manager Melvin Martins, who has in excess of 20 years of experience in the dairy business. Tr. Hr'g.. Mot. Stay Relief at 631:14-632:6, November 6, 2012, ECF No. 1062.

Second, the debtors do not have access to working capital. Souzas' assets are fully encumbered. Tr. Hr'g. on Mot. Stay Relief at 171:1-14, Oct. 26, 2012, ECF No. 1016. Efforts to find other financing have not been successful and, hence, there is no third party lender willing to fund the reorganization. Declaration of Alvin Souza ¶21, October 12, 2012, ECF No. 877. Their only sources of income are milk checks and, to a lesser extent, the sale of other dairy and related agricultural products. But each of those proceeds are fully encumbered in favor of Wells Fargo Bank. Tr. Hr'g. on Mot. Stay Relief at 171:1-14, Oct. 26, 2012, ECF No. 1016. Wells Fargo will not consent to the use of that cash collateral or support a plan of reorganization. And the debtors do not have the ability to offer substitute collateral such that the plan can be crammed down and cash collateral used over the objection of the bank. 11 U.S.C. § 1129(b)(2)(A).

Third, the dairy industry is under stress. Milk prices are low and feed prices are high. Declaration of Alvin Souza ¶11, October 12, 2012, ECF No. 877; Tr. Hr'g.. Mot. Stay Relief at 570:11-15, November 6, 2012, ECF No. 1062.

Fourth, the debtors' financial projections are neither adequate, nor accurate. There are at least three manifestations of the problem. Initially, the plan assumes substantially increased productivity from the Souzas' herd. Alvin Souza and his experts disagree as to the current production levels. Souza unequivocally stated--even as late as October

16

12, 2012--that production is between 52 and 54 pounds of milk per day per cow.  Declaration of Alvin Souza ¶22, October 12, 2012, ECF No. 877; *see also*, Tr. Hr'g. on Mot. Stay Relief at 177:7-19, October 26, 2012, ECF No. 1016.  In contrast, veterinarians Gregory Smith and James Davis, ruminant nutritionist David Ledgerwood, and farm manager Melvin Martins believe that production is 58-60 pounds of milk per cow per day.  Tr. Hr'g. Mot. Stay Relief at 611:12-16, 626:11-20, 647:4-14, and 572:13-574:7, November 6, 2012, ECF No. 1062.  The court finds that Alvin Souza is best positioned by his experience with these particular animals to address the productivity of the herd and that his testimony as to current production levels is more credible.

Smith, Davis, Ledgerwood, and Melvin Martins believed that production could reach levels as high as 65-70 pounds per cow per day in the spring of 2013.  But the court does not accept this testimony as credible.  If the solution to the debtors' financial problems was as simple as changing the animals' rations and/or downsizing, why wasn't this done previously?  The argument that production will, in the future, increase has a problem: it lacks basis in historical fact.  The average cow on the Souza dairy has historically been 11 and 13 pounds per day of milk lighter than predicted by the debtors' experts.  Dr. Davis, as well as Messrs. Ledgerwood and Martins, were each employed for less than one month prior to the commencement of the hearing on the motion.  Tr. Hr'g. Mot. Stay Relief at 613:1-8, 624:35, 635:2-3, November 6, 2012, ECF No. 1062.  Having had only limited opportunity to observe productivity the court gives little weight to the testimony of these witnesses.  Dr. Smith commenced productivity work for the debtor in April 2012, but only described productivity levels as reaching 57-60 pounds of milk per cow

17

in the two or three weeks prior to his testimony.  Tr. Hr'g. Mot. Stay Relief at 572:9-20, November 6, 2012, ECF No. 1062.  Though helpful, his testimony does not rise to the level required to demonstrate that sustained production at the 62-64 pounds of milk per cow per day is feasible over the next five years. Additionally, Dr. Smith's is a biased witness as a: personal friend of the debtors, a creditor, chairperson of Unsecured Creditors Committee, and source of payment of debtors' retainer to Blakeley & Blakeley of ($45,000).   Tr. Hr'g. Mot. Stay Relief at 567:13-17-568:1, November 6, 2012, ECF No. 1062.  For these reasons, the court does not believe that it is more likely than not that the debtors will be able to sustain the projected productivity overt the life of the plan.

Another manifestation of the problem is the failure to address the future.  Increased productivity is based, at least in part, on the existence of a young, and high volume producing herd.  Tr. Hr'g. Mot. Stay Relief at 574:2-576:10, November 6, 2012, ECF No. 1062.  But the financial projections fail to address the inevitable change in the composition of the Souzas' herd and the impact of that change on productivity during the plan.  Dr. Gregory Smith, a veterinarian, testified that the herd had a high percentage (about 40%) of animals in the peak of their productive life cycle and  that he expected two to three years of good volume lactation from these animals.  Tr. Hr'g. Mot. Stay Relief at 576:6-10, November 6, 2012, ECF No. 1062.  But the plan is scheduled to run five years prior to a balloon payment, suggesting that many, and perhaps all, of these animals will have been retired or at least entered a lower production portion of their life cycle.  Souzas have not sufficiently addressed this issue.

18

The projections are also inadequate as to the future in that they fail to address the second through fifth years of the plan. Accountant David Sousa's projections only extend through December 2013, which is the end of the first year of a probable five-year plan. Tr. Hr'g. Mot. Stay Relief at 447:23-448:2, November 5, 2012, ECF No. 1051. Souzas offer no evidence of these years because, according to accountant David Sousa, who specializes in accounting for dairies, financial projections beyond that are not possible as the price of milk cannot be predicted that far in advance. Tr. Hr'g. Mot. Stay Relief at 445:18-21, November 5, 2012, ECF No. 1051. Perhaps this is true. But because the Souzas bear the burden of proof on the issue, the inability to provide such financial projections cuts against them.

Finally, one of the key components of the Souza plan is re-financing with a third party lender, allowing the Souzas to pay off the plan, including the balloon payments due Wells Fargo Bank and Bank of the West. But in making this projection, accountant David Sousa assumed a 5% per year increase in the value of the Souzas' real property, which he believes makes the Souzas attractive borrowers to conventional lenders. Tr. Hr'g. Mot. Stay Relief at 447:1-451:6, November 5, 2012, ECF No. 1051 ("assuming" a 5% per year increase in value). It also assumes that conventional lenders will then be agreeable to takeout financing. But the debtors have not established that real estate prices will, in fact, increase 5% per year such that a refinance is possible or that lenders may , in fact, be interested in such a loan at that date.

As a result, the court does not find the Souzas have carried their burden of proof on feasibility.

/ / / /

19

## Conclusion

For each of these reasons, the motion is granted.  Federal Rule of Bankruptcy Procedure 4001(a)(3) is not waived.  Wells Fargo Bank shall prepare and lodge an order consistent with the findings herein.


DATED: November 26, 2012


_____
FREDRICK E. CLEMENT, Judge
United States Bankruptcy Court

20

1    serve on:

2    Rene Lastreto II, Esq.
     Michael J. Gomez, Esq.
3    LANG, RICHERT & PATCH
     P.O. Box 40012
4    Fresno, CA 93755-0012

5    Jesse H. Austin III, Esq.
     Cassie Coppage, Esq.
6    PAUL HASTINGS LLP
     1170 Peachtree St., N.E., Suite 100
7    Atlanta GA 30309

8    Johnny White, Esq.
     BLAKELEY/BLAKELEY
9    2 Park Plaza, Suite 400
     Irvine, CA 92614
10

     David M. Mannion, Esq.
11    BLAKELEY/BLAKELEY
     100 Park Ave #1600
12    New York, NY 10017

13    Kurt F. Vote, Esq.
     WANGER, JONES, HELSLEY
14    265 E. River Park Circle, Suite 310
     Fresno, CA 93720
15

     Bradley A. Silva, Esq.
16    8050 N. Palm Ave, Suite 300
     Fresno, CA 93711
17

     Office of the United States Trustee
18    2500 Tulare Street
     Suite 1401
19    Fresno, CA 93721

20

21

22

23

24

25

26

27

28